UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------x
ANGELO KARATZAS,

                Plaintiff,

     -against-

HERRICKS UNION FREE SCHOOL DISTRICT and JIM
BROWN (in his official and individual capacities),

             Defendants.
--------------------------------------------------------------------------------x

**Memorandum of
Decision & Order**
15-cv-2888(ADS)(AKT)

APPEARANCES:

**Ricotta & Marks, P.C.**
*Attorneys for the Plaintiff*
31-10 37th Avenue, Suite 401
Long Island City, NY 11101
      By:   Thomas A. Ricotta, Esq., Of Counsel

**Miranda Sambursky Slone Sklarin Verventiotis, LLP**
*Attorneys for the Defendants*
240 Mineola Boulevard
Mineola, NY 11501
       By:   Maurizio Savoiardo, Esq., Of Counsel

**SPATT, District Judge:**

    On May 19, 2015, the Plaintiff Angelo Karatzas ("Karatzas" or the "Plaintiff") commenced this employment discrimination action against his former employer, the Defendant Herricks Union Free School District (the "District"), and its individual Director of Facilities Jim Brown ("Brown," together with the District, the "Defendants"), alleging disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and 42 U.S.C. § 1983 ("§ 1983").

    Presently before the Court is a motion by the Defendants, pursuant to Federal Rule of Civil Procedure ("FED. R. CIV. P.") 56, seeking summary judgment and dismissal of the complaint.

    For the reasons that follow, that motion is granted in part and denied in part.

## I.    BACKGROUND

Except as otherwise noted, the following salient facts are drawn from the parties' respective statements of undisputed material facts, submitted pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.  For purposes of this motion, they are construed in the light most favorable to the Plaintiff.

### A.    The Parties

The District is a municipal school district comprised of six schools and a community center.  One of the buildings within the District's purview is Herricks High School (the "High School").

Brown is the District's Director of Facilities.  In that capacity, he is responsible for directing and overseeing the operations of the maintenance, grounds, and custodial crews for all of the District's properties.  He oversees approximately 65 employees.

The Plaintiff is an adult individual, who, from October 21, 2002 to March 3, 2014, was employed by the District as a Cleaner in the High School.   At all relevant times, the Plaintiff worked an evening shift in the High School from 3:00 P.M. to 11:00 P.M.

Relevant here, the Plaintiff suffers from epilepsy.   In a supporting affidavit, the Plaintiff asserted that, when he experiences an epileptic seizure, his "ability to move and think" is impacted, and he has occasionally lost consciousness.  *See* Feb. 10, 2017 Affidavit of Plaintiff in Opposition to Defendants' Motion for Summary Judgment ("Pl. Aff."), DE [42-2], at ¶ 13.

However, it is undisputed that the Plaintiff's condition is well-controlled with prescription medication and, for approximately twenty years prior to starting work for the District, he had not experienced a seizure or any associated symptoms.  In this regard, it is undisputed that the Plaintiff has had an unrestricted driver's license since the age of seventeen, and that neither his epilepsy nor any related impairment has ever interfered with his ability to perform the essential functions of his job.

Nevertheless, on December 14, 2012, the Plaintiff suffered a seizure at home – his first in almost 30 years. He suffered another seizure on April 2, 2013. As discussed more fully below, the Plaintiff concedes that he never advised Brown or anyone else at the District about these occurrences.

**B.    The Relevant Non-Parties**

Richard Russo ("Russo") is the Head Custodian at the High School. In that capacity, Russo is responsible for directing and overseeing the cleaning and maintenance of the High School's facilities, including the bathrooms, classrooms, offices, hallways, gym, and surrounding grounds.

Beginning in September 2007, Russo was the Plaintiff's immediate supervisor.

Bogden Seroka, also known as Bob Seroka ("Seroka"), is the Assistant Head Custodian at the High School. In that capacity, he supervised the evening cleaning crew at the High School, including the Plaintiff.

Vincent Haughwout ("Haughwout") is the Vice President of the Herricks Teachers Association. During the relevant time period, he and Gary Chudd ("Chudd") served as union representatives for the Plaintiff.

**C.    The Relevant Facts**

As noted above, at all relevant times, the Plaintiff worked as a Cleaner in the High School. Initially, he was assigned to clean the gym; five offices; three locker rooms; and two bathrooms. This was his assignment at the time Russo became his supervisor in September 2007.

The record contains conflicting evidence regarding the overall quality of the Plaintiff's job performance. It appears that Karatzas was initially hired on Brown's recommendation, and an early performance evaluation from January 30, 2003 indicates that the Plaintiff performed his job well. *See* July 29, 2016 Declaration in Support of Motion for Summary Judgment by Maurizio Savoiardo, Esq. ("Savoiardo Decl."), DE [38-1], at Exhibit "F."

In particular, with respect to the quality of his work (defined as "the neatness, completeness and thoroughness of work performed"), the Plaintiff was evaluated as "satisfactory," meaning his performance "represent[ed] the expected level for [his] position," although "[g]uidance may be required to complete tasks." He also received satisfactory evaluations in the areas of knowledge of work; use of time; judgment; initiative; responsibility and dependability; attendance and punctuality; acceptance of constructive criticism; care and use of equipment; and general appearance and personal grooming.

In the areas of quantity of work (defined as "the amount and promptness of work"); interest; cooperation; personal relationships; and attitude toward children, staff and others serviced, he was evaluated as "very good," meaning his "[a]chievements almost always meet performance objectives and occasionally exceed expectations," and he requires "only minimal supervision."

In written comments, Brown indicated that the Plaintiff "[w]orks well with others" and "is willing to learn and picks up command of tasks assigned to him quickly." He further noted that the Plaintiff "performs the jobs in a timely fashion and is cooperative with all." As for any performance deficiencies, Brown indicated only that the Plaintiff needed additional training "in specific areas related to cleaning and floor care." Based on his observations, Brown "highly recommend[ed]" that Karatzas be offered a permanent position with the District.

On the other hand, the record contains an April 15, 2008 memo from Russo to Brown, which states the following:

> On Tuesday April 11th I had a quick discussion with Angelo [Karatzas] about two work requests to clean areas in his section. The requests came on the standard yellow work request form that is usually used there. They were not letters or write ups. The requests were to sweep and mop the floor in the coach's office in the new gym, and to scrub the gym floors. I gave Angelo the requests and asked him to try to accommodate both of them that evening, time permitting. I told him to make sure he took care of the coach's office, and that we had no games so he might be able to scrub the floor in at lease [sic] one of the gyms. After giving him these requests he proceeded to the gym and confronted one of the coaches responsible for the work request. I was told by several people that he became loud, irate, and started slamming things around. He ripped up the work requests and threw them on the floor. All of this was done in the presence of students and other coaches. In my point of

view, school staff and students may feel uncomfortable and threated by behavior such as this. This is not the first incidence of this nature either.  Roughly a month and a half ago Angelo got loud with me over an incident where Charlie did not get a chance to put a new mop on his handle after removing the old one that was used in a large blood clean up.  We were in the back hall between the trainers room and team locker room.  Students and teachers were present once again, and he unloaded on me despite my requests that he calm down and cool off before continuing the discussion.

After the incident on April 11th, Angelo has become very brash with his comments and demands to both me and the rest of the staff.  In a very nasty manner, he told some of the night crew that were working overtime one evening to get over to the gym and clean his section for him.  He has tried to pawn off work on others, and has told Charlie to clean certain areas in his section because he feels Charlie doesn't do anything.  His section is increasingly becoming worse, and all he keeps saying is that he does not have enough time to do his section.  It has been reported by others as well as seen by myself that he has enough time to walk all over the building talking to others as well as sit/stand and watch games and practice.  At the beginning of the year he was able to manage his time and complete his section satisfactorily.  Now, despite efforts to assist him or explain how to use his time more efficiently, he has a lot of trouble completing his section properly and on time.  His overall attitude has become erratic and unpredictable and it seems as if he has no fear of the consequences of his actions.  At this point I feel strong disciplinary action should be taken to put an end to this behavior.

*See* Savoiardo Decl., Ex. "G."

The Plaintiff substantially denies the truth of the assertions contained in this memo. Namely, he denies having any discussion with Russo regarding work requests on April 11, 2008; he denies that any confrontation occurred between himself and a coach; he denies that the quality of his work was ever in decline or below satisfactory; he denies claiming that he lacked sufficient time to complete his nightly duties; and he denies ever having a discussion during which he "got loud" with Russo.

At his deposition in this case, as well as in a supporting affidavit, the Plaintiff has asserted that everything contained in this memo is false and that it was fabricated at a later date to support the District's pretextual basis for taking disciplinary action against him.  *See, e.g.*, Pl. Aff. at ¶ 5. However, in a sworn declaration of his own, Russo reiterated the truth of the material facts set forth in his memo.  *See* July 28, 2016 Affidavit of Richard Russo in Support of Motion for Summary Judgment ("Russo Decl."), DE [38-21], at ¶¶ 11-12.

During the 2010-2011 schoolyear, the Plaintiff was reassigned to clean the science wing of the High School, which included approximately ten to fourteen classrooms and a few bathrooms. As to the classrooms, he was required to sanitize all of the desks and chairs; sweep and mop the floors; wipe down the chalkboard; and empty the wastepaper baskets each night.

The Defendants contend, and the Plaintiff does not materially deny, that during the period of time he was assigned to clean the science wing of the High School, Brown and Russo received reports of missing science equipment and candy from teachers' offices and classrooms. Apparently, based on certain prior conduct, the Defendants suspected that the Plaintiff may have been responsible for these missing items.

In this regard, the record contains a June 13, 2013 memo from Russo to Brown, in which Russo states that, over the course of that year, the Plaintiff had repeatedly been found hoarding cleaning supplies and "drags," a term apparently relating to "the tassel end of a mop." *See* Russo Decl. ¶ 18; *see also* May 26, 2016 Deposition of the Plaintiff ("Pl. Dep."), DE [38-4], at 168-69 (describing a "drag" as "the bottom part of a broom" that is used to "sweep the hallway").

The memo also noted that, despite being counseled otherwise, the Plaintiff routinely failed to lock classroom doors in his section, potentially resulting in the theft of school property.

In relevant part, Russo's June 13, 2013 memo states the following:

Over the course of this year I have had several conversations with Angelo. He has been found hoarding cleaning supplies and drags on multiple occasions. This behavior has caused us to question the drag servicing company, as well as forced us to order more drags and supplies from vendors since it appeared we were out of stock. It causes friction between his peers, because there are not enough drags to properly maintain sections. He hides drags inside boxes, under supplies, in walls, behind shelving, and many other places. I personally searched and recovered a large amount of drags from his closet earlier this school year. I verbally warned him that any further incidents would result in disciplinary action. As you know, we have been very short on drags again. We have questioned Angelo several times, since he has been known to hoard them. I was in his closet yesterday looking for something and started to find hidden drags and supplies. As usual, he had hidden them under light bulbs in boxes, under other supplies, and inside a wall space for ductwork. Upon a hunch, I decided to search the book room next to his closet and found a box wrapped in garbage bags with drags in them as well. I recovered 15 drags, when he should only have had 5 or 6. I confronted him at the beginning of his shift regarding what I found. He denied putting them

there and claimed that he did not know how they got there.  Later around 6:15pm he spoke to me and confirmed he had taken and put them there because he was mad at me.  He confessed that he also had more hidden in his section in the prep/office room across from his closet.  He brought down two more boxes with another 23 drags.  In total, he had 38 drags in his possession.

On a separate note, there has been some theft in Angelo's section.  There were some issues with doors being left open, or Angelo unlocking and opening all the doors to room hop and clean in waves.  Both Bob Seroka and I spoke to Angelo and explained that this allows anyone access to areas that needed to be secured (especially labs containing chemicals and valuable equipment).  We told him to secure all the doors in his section as soon as he gets up there.  He was also told that he was to open one classroom at a time to clean it, and once finished to lock it and move onto the next.  Since then, there have been more thefts.  We now know that Angelo did not follow directions and was still opening up all the classrooms, as well as not securing these rooms after they were cleaned.  These thefts could have been avoided if he was following directives.

*See* Savoiardo Decl., Ex. "J."

The Plaintiff again substantially denies the truth of the assertions contained in this memo.  Namely, he denies leaving classroom doors unlocked or hoarding cleaning supplies.  Rather, the Plaintiff asserts that Seroka distributed to members of the cleaning crew five or six "drags" on a weekly basis, and that he merely stored the supplies given to him in the second-floor storage closet he regularly used.  Further, he denies having admitted to any wrongdoing during a conversation with Russo, and otherwise denies any discussion with Russo or Seroka during which his job performance was called into question.

Again, the Plaintiff asserts that this memo was fabricated at a later date to support the District's pretextual basis for taking disciplinary action against him.  *See* Pl. Aff. ¶ 5.

Nevertheless, on July 1, 2013, a meeting to address Russo's memo was apparently held, at which time the Plaintiff, Russo, and Brown were present.  According to a July 8, 2013 memo by Brown memorializing this event, the reason for the meeting was the Plaintiff's "failure to follow direction from his supervisor," and noted that the Plaintiff was advised that behavior such as that outlined in Russo's memo would not be tolerated and any further infractions of the applicable rules

would subject the Plaintiff to disciplinary action and possibly termination.  *See* Savoiardo Decl., Ex. "K."

The Plaintiff denies that this memo accurately reflects the July 1, 2013 meeting.  In fact, he appears to question whether the meeting occurred at all, and maintains that he neither received any verbal or written criticisms of his job performance nor ever attended a meeting the focus of which was any deficiency in his job performance.

However, importantly, the Plaintiff's signature appears at the bottom of the memo, acknowledging his receipt of a copy.  Despite denying the truth of the memo's contents, he conceded having signed it because he felt "pressured" to do so.  *See* Pl. Dep. at 180, 233-34, 247.  Indeed, as to this and several other written memos in the record, the Plaintiff appears to contend that District officials simply placed the memos in front of him at a later date and threatened to fire him if he refused to sign them.  *See, e.g.*, Pl. Dep. at 179-80, 189, 233, 248; Pl. Memo of Law at 5-6.

On an unspecified date in the summer of 2013, the Plaintiff's work assignment was again changed, although the parties dispute the surrounding circumstances.

According to the Defendants, rather than continuing to clean the science wing of the High School, the Plaintiff was reassigned to clean bathrooms throughout the school.  In a supporting affidavit, Russo asserted that this was the "result of the problems and complaints with Plaintiff's performance."  Russo Decl. ¶ 21.  According to Russo, the bathrooms are spread throughout the entire building, thus, consistent with the concerns raised in his June 13, 2013 memo, Russo assertedly believed that this change "would help Plaintiff to properly clean one room at a time before moving on to the next, and the risk of theft would be reduced if Plaintiff failed to lock a bathroom door, as the bathrooms did not contain anything of value to be stolen."  *Id.* ¶ 22.

Further, Russo asserted that the Plaintiff's proposed new workload was comparable in scope, if not less than his prior workload.  *See id.* ¶ 23.  In particular, according to Russo, the

bathrooms are significantly smaller than the classrooms and they do not contain the same furniture, such as desks and blackboards, which must be cleaned on a nightly basis. *See id.*

The Plaintiff acknowledges that he was reassigned to clean the school's bathrooms, but disputes that his new workload was at all comparable to his prior workload. In this regard, the Plaintiff asserts that his workload was "effectively doubled" because, in addition to the bathrooms, he was also assigned to clean the gym. Further, he disputes that his job performance played any role in the situation, and claims that Russo routinely changed the cleaners' designated work areas.

In any event, the Defendants contend that the Plaintiff failed to satisfactorily perform his new duties. Consistent with this assertion, the record contains a "Bathroom Cleaning Checklist" that Russo evidently created on October 2, 2013 to assist the Plaintiff in properly completing all facets of his new assignment. *See* Savoiardo Decl., Ex. "M"; Russo Decl. ¶ 24. In this regard, the record contains a printout of certain computer data purporting to show that the checklist was created at approximately 1:45 P.M. on October 2, 2013 and printed at approximately 2:14 P.M. that same day. *See* Savoiardo Decl., Ex. "M."

Despite denying any deficiencies in his job performance, the Plaintiff concedes that Russo required him to complete the checklist after cleaning every individual bathroom, which was not standard operating procedure for all cleaners. *See* Pl. Dep. at 186-87. However, the Plaintiff disputes the timetable set forth by the Defendants, denying that he was given this checklist in October 2013, and claiming instead that the District only began making him complete the checklist *after* learning about his epilepsy later that year.

As noted above, this version of events by the Plaintiff is apparently contradicted by the computer data associated with the checklist. Nevertheless, the Plaintiff again asserts that the Defendants fabricated this evidence at a later date to support their pretextual basis for taking disciplinary action against him. *See* Pl. Dep. at 190-91; *see also* Pl. Aff. ¶ 5.

Also apparently contrary to the Plaintiff's denials, on October 29, 2013, Brown, Russo, and Seroka conducted a walk-through of the bathroom areas for which the Plaintiff was responsible. The Plaintiff and his union representative, namely, Gary Chudd, were present for the walk-through. An October 30, 2013 memo by Russo memorializing this event states the following:

> On Tuesday October 29, a walk-through was conducted of the bathrooms that Angelo Karatzas cleans as part of his section. In attendance were Angelo Karatzas, Cleaner, Richard Russo, Head Custodian, Bob Seroka, Assistant Head Custodian, and Gary Chudd, Union Representative. The purpose of this walk-through was to show Angelo the areas in his bathrooms that he has not been cleaning properly. He has been spoken to by all the above parties separately regarding these cleaning issues on various occasions. All of us took the time together as a group to show him was he is doing correctly and incorrectly. I directed him to make the necessary corrections and to maintain them using his checklist as a guide. At this point, we have made all attempts to set Angelo on the correct path. I have informed him that any further deviations from the cleaning checklist and schedule, or failure to clean the bathrooms properly will result in further disciplinary action and possible termination.

*See* Savoiardo Decl., Ex. "L"; *see also* Russo Decl. ¶ 26.

The Plaintiff acknowledges that this walk-through occurred, and concedes that his signature again appears at the bottom of the memo, acknowledging his receipt of a copy.

However, he again disputes that the memo accurately reflects the events described, contending instead that the walk-through "did not involve any alleged deficiencies in [his] performance, but rather was an inspection of sorts where certain things that needed to be addressed were highlighted." Pl. Aff. ¶ 4. The Plaintiff claims that he "did not take this meeting to be one where deficiencies in [his] performance were being identified." *Id.* Nevertheless, despite the memo's alleged inaccuracies, the Plaintiff again acknowledges signing the document because he was "pressured" into doing so with threats of termination if he refused.

Of importance, the memo, which, as noted, is dated October 30, 2013, explicitly references the checklist that the Plaintiff denies receiving until several months later. As previously noted, his explanation for this discrepancy is to assert that the evidence was fabricated.

In early-December 2013, while pushing a cart in the High School gym, the Plaintiff experienced a tingling sensation in his right hand and forearm, which he recognized to be an early

symptom of an epileptic seizure. Although he had taken his prescription seizure-control medication that day, he immediately took an extra dose, which he carried with him at all times.

Fortunately, his symptoms subsided and he was able to continue performing his normal duties.

However, on this occasion, the Plaintiff informed Russo that he suffered from epilepsy; that he almost had a seizure; and that he wanted Russo to have notice of that fact. It is undisputed that this was the first time the Plaintiff had informed anyone at the District of his alleged disability. Indeed, as noted above, the Plaintiff does not allege that his epilepsy ever interfered with his ability to perform the essential functions of his job, and so it is undisputed that he never requested a workplace accommodation or otherwise advised the District that he was unable to perform or had difficulty performing his duties as a Cleaner.

According to the Plaintiff, Russo indicated during this conversation that he would also advise Brown of his alleged disability. However, there is no direct evidence that Russo ever did so, and in a supporting affidavit, Brown denied having knowledge of this situation at all relevant times. *See* July 28, 2016 Affidavit of James Brown in Support of Motion for Summary Judgment ("Brown Aff."), DE [38-22], at ¶ 15.

Nevertheless, at his deposition in this case, the Plaintiff testified that a week after disclosing his condition to Russo, Brown confronted him about it, thus confirming that Russo had, in fact, shared the information. Specifically, the Plaintiff described a meeting in Russo's office, at which Brown and Seroka were also present, and during which Brown asked the Plaintiff whether, in fact, he had epilepsy. *See, e.g.*, Pl. Dep. at 111, 116-17, 121-24.

However, the Plaintiff later wavered on this account of the material facts:

Q:   When you first walked into the room, did Mr. Brown say anything before anybody else for this meeting that you say occurred?
A:   Not that I recall. I don't know.
Q:   You don't recall Mr. Brown saying anything in this meeting?
A:   Whatever they wanted to talk to me about, which I don't remember.

Q:   This meeting where Mr. Brown allegedly confronted you, right, you don't remember anything he said?

A:   No, I don't.

Q:   In this meeting where you're allegedly confronted by the school district for having epilepsy, as you claim in your lawsuit, you don't recall anything Mr. Russo said in the meeting?

A:   No.  I don't recall.  No, I don't.

*        *        *

Q:   To sum it up, the meeting where you claim you were confronted for having epilepsy by the school district, you don't have a recollection of what any of the three people whom you claim were in the meeting said, correct?

A:   Yes, correct.

Pl. Dep. at 136.

On February 14, 2014, Danielle Hurley, a teacher at the High School, sent an e-mail to Andrew Frisone and Bryan Hodge, who were also teachers at that time.  *See* Savoiardo Decl., Ex. "N." The e-mail stated that Hurley had kept candy in one of the drawers of a filing cabinet in her classroom, and that at some point between the afternoon of Wednesday, February 12, 2014, and the afternoon of Friday, February 14, 2014, someone had stolen all of the candy out of the filing cabinet drawer.

Shortly thereafter, Frisone forwarded Hurley's e-mail to Jane Modano, the High School Principal, and Karen Hughes, the Chairperson of the High School's Science Department.  Hughes responded that she had begun concealing her candy bowl after two pounds of candy were stolen from her office over a weekend in January.  Hughes also noted that a $400 piece of science equipment had recently been stolen from another teacher's classroom.

These complaints were made known to Brown, who reviewed the surveillance footage from outside Hughes's office on the evening of Friday, February 14, 2014.  It is undisputed that the footage, a copy of which is in the record, *see* Savoiardo Decl., Ex. "Q," depicts the Plaintiff using a key to gain entrance to Hughes's office at 6:55 P.M. and then exiting the office eating three pieces of candy.

In a supporting affidavit, Brown asserts that the Plaintiff was not assigned to clean Hughes's office, and had no other valid reason to enter that room.  *See* Brown Aff. ¶ 11.

The Plaintiff concedes that he was not officially assigned to clean Hughes's office.  However, he testified at his deposition that, on Saturday, February 15, 2014, he believed standardized college admissions testing was scheduled to take place in the High School.  *See* Pl. Dep. at 200.  The Plaintiff claimed that when such testing occurs, the members of the cleaning crew "all chip in and help each other" by emptying all the wastepaper baskets, even those located in sections of the school not usually within the cleaners' purview.  *See id.* at 201-02.  Thus, the Plaintiff contends that he was emptying the wastepaper basket in Hughes's office when he was captured on the surveillance video.  As for the candy, the Plaintiff testified that it was located in a bowl on her desk, which he perceived to be for communal use.  *See id.*  at 221-23.

The Court pauses to note that, as to the Plaintiff's testimony that he entered Hughes's office for the express purpose of emptying her wastepaper basket, the surveillance footage of this event shows him entering the office without any cleaning equipment and exiting without a wastepaper basket or anything other than the candy.

On March 3, 2014, Brown called a meeting with the Plaintiff and Chudd, his union representative, at which time he confronted the Plaintiff about stealing candy from Hughes's office.  At this meeting, the Plaintiff admitted entering Hughes's office and taking the candy, but, as noted above, expressed his belief that the candy was for public consumption.

It is undisputed that, during this meeting, the Plaintiff resigned from his position as a cleaner.  However, the parties provide diverging accounts of the relevant circumstances.

Namely, the Plaintiff testified at his deposition that Brown threatened to call the police and have him arrested for stealing the candy if the Plaintiff did not resign.  *See* Pl. Dep. at 244.  In a supplemental affidavit, he also asserted that Brown threatened to impede the Plaintiff's ability to secure employment in other schools on Long Island if he did not resign.  *See* Pl. Aff. ¶ 11; *see also* Pl.

Dep. at 245-46 (testifying that his decision to resign was motivated, at least partly, by a concern that Brown would "make [his] life miserable in working in any other school").

On the other hand, in a supporting affidavit, Brown stated that, given the Plaintiff's admission of entering Hughes's office without authorization and taking candy, coupled with his negative performance history, he was given a choice to resign or face disciplinary proceedings by the District. *See* Brown Aff. ¶ 14.

In any event, it is undisputed that, after conferring privately with his union representative, the Plaintiff handwrote and signed a letter of resignation.

The Court reiterates that, although Russo allegedly indicated to the Plaintiff that he would advise Brown that the Plaintiff suffered from epilepsy, there is, at best, conflicting evidence that he ever did so, and, despite the Plaintiff's contrary testimony, Brown denied having any knowledge of the Plaintiff's condition on the date of his resignation.

On these facts, the Plaintiff brings claims for disability discrimination under the ADA and § 1983.

## II.    DISCUSSION

## A.    The Standard of Review

Under FED. R. CIV. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The Court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party.'" *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1998)).

" '[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' "

*Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 173-74 (2d Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

B.    **The Plaintiff's Claims under the ADA**

"The ADA prohibits 'discriminat[ion] against a qualified individual on the basis of disability in regard to[, *inter alia*] . . . discharge of employees.'" *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) (quoting 42 U.S.C. § 12112(a)).

"Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973))." *Id.* Namely, " '[a] plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate, non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext.'" *Id.* (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2005)).

1.    **The Plaintiff's Prima Facie Case**

" 'To establish a prima facie case under the ADA, a plaintiff must show . . . that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.'" *Jarrell v. Hosp. for Special Care*, 626 F. App'x 308, 311 (2d Cir. 2015) (quoting *Sista*, 445 F.3d at 169).

The Second Circuit has "explained that this burden is not a heavy one," *McDonnell v. Schindler Elevator Corp.*, 618 F. App'x 697, 698 (2d Cir. 2015); that it is "minimal and de minimis," *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2015). "Nevertheless, it does require evidence that allows for a reasonable inference of discrimination." *Id.*

In this case, it is undisputed that the District is subject to the ADA and that the Plaintiff was qualified to perform the essential functions of his job, with or without a reasonable accommodation. However, the Defendants dispute whether the evidence in the record is sufficient to sustain the Plaintiff's initial burden of establishing that he was disabled within the meaning of the ADA, and if so, that he suffered an adverse employment action because of his disability.

> ### a.    As to Whether the Plaintiff has Made a Prima Facie Showing that he is Disabled under the ADA

The ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). This definition is "construed in favor of broad coverage of individuals . . . to the maximum extent permitted by the [ADA]." *Id.* § 12102(4)(A).

Here, the Plaintiff alleges that his epilepsy constitutes a disabling impairment, or, alternatively, that the Defendants regarded his condition as such.

> ### i.    As to Whether the Plaintiff's Epilepsy is a Disabling Impairment

The first method of establishing a disability under the ADA involves satisfying a multi-part definition, namely, the Plaintiff's epilepsy must be shown to be: (1) a physical or mental impairment, which (2) substantially limits, (3) one or more of his major life activities. *See Fall v. New York State United Teachers*, 289 F. App'x 419, 420 (2d Cir. 2008).

The law is clear that all three of these elements must be satisfied before a plaintiff has met his or her burden of establishing a disability under the statute. In particular, "[t]he Court of Appeals for the Second Circuit has held that district courts should apply the three-step approach taken by the Supreme Court in *Bogden v. Abbott*, 524 U.S. 624, 118 S. Ct. 2196, 141 L. Ed. 2d 540 (1998), to determine whether a plaintiff is disabled." *Hernandez v. Int'l Shoppes, Inc.*, 100 F. Supp.3d 232, 257 (E.D.N.Y. 2015) (citations omitted).

> Under this analysis: [The] plaintiff must first show that [ ]he suffers from a physical or mental impairment. Second, [he] must identify the activity claimed to be impaired and establish that it constitutes a major life activity. Third, the plaintiff must show that h[is] impairment substantially limits the major life activity previously identified.

*Id.* (quoting *Weixel v. Bd. of Educ. of N.Y.*, 287 F.3d 138, 147 (2d Cir. 2002)).

### (A)    First Element: A Physical or Mental Impairment

"In order for a plaintiff to show that he suffered from an impairment, he must demonstrate that the alleged impairment fits within the EEOC's regulations defining physical and mental impairments." *Id.*

Relevant here, the EEOC regulations, which "are entitled to great deference in interpreting the ADA," *Muller v. Costello*, 187 F.3d 298, 312 (2d Cir. 1999), expressly provide that, for purposes of establishing a "disability" under the statute, a physical or mental impairment includes epilepsy. *See* 29 C.F.R. § 1615.103(1)(ii). Thus, there is no question that the first element of this standard is satisfied.

The Plaintiff contends that this fact alone is sufficient to compel the conclusion that he is disabled under the ADA. *See* Pl. Memo of Law at 11 (arguing that the inclusion of epilepsy in the relevant regulatory definition proves, as a matter of law, that the Plaintiff is disabled). However, this argument is misplaced, as it fails to account for the remaining elements of the relevant standard set forth above. *See Hernandez*, 100 F. Supp. 3d at 257 (describing the "[t]hree-step test used to determine whether disability exists").

In other words, simply establishing that epilepsy is a recognizable "physical or mental impairment" under the statute is not enough; the Plaintiff must still make a prima facie showing that his epilepsy substantially limits one or more major life activities.

### (B)    Second Element: Major Life Activities

The applicable EEOC regulations provide a non-exhaustive list of "major life activities," including: "[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking,

standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i)(i). Major life activities also include the operation of major bodily functions, including neurological and brain functions. *See id.*

In this case, the Plaintiff's legal memorandum fails to identify a major life activity that he contends is impaired by his epilepsy. However, in a supporting affidavit and in his counterstatement of undisputed facts, the Plaintiff asserts that his ability to walk, stand, think, communicate, move, and remain conscious are impaired during epileptic seizures. *See* 56.1 Stmt. ¶¶ 176, 181; Pl. Aff. ¶ 13.

For this proposition, the Plaintiff relies generally on medical records of neurologist Gary Kaplan, M.D, with whom the Plaintiff was evidently treating from January 2013 to July 2015. However, other than confirming that the Plaintiff experienced a seizure on April 2, 2013, Dr. Kaplan's records are illegible and the Plaintiff fails to refer the Court to any specific page or entry by Dr. Kaplan that would support an impairment to the major life activities of walking, standing, thinking, communicating, moving, and/or remaining conscious.

Nevertheless, the Court notes that hospital records relating to the Plaintiff's earlier, December 14, 2012, seizure indicate that he in fact lost consciousness on that occasion and fell down a flight of ten wooden steps. *See* Savoiardo Decl., Ex. "H." He reportedly awoke confused, lethargic, and in pain after an unknown period of unconsciousness. *See id.*

In the Court's view, viewing the evidence in the light most favorable to the Plaintiff, this is sufficient to sustain the Plaintiff's minimal prima facie burden of establishing that his epilepsy impairs a major life activity.

### (C)   Third Element: Substantial Limitation

Finally, in order to warrant the conclusion that the Plaintiff's epilepsy is a disabling condition, the evidence must demonstrate that it "substantially limits" his ability to perform the

major life activities identified above.  *See Bartlett v. N.Y. State Bd. of Law Exam'rs*, 226 F.3d 69, 84 (2d Cir. 2000) (noting that "it is not enough for a plaintiff to prove that an impairment 'implicates' a major life activity – [ ]he is required to prove that the impairment 'substantially limits' that activity").

However, " 'substantially limits' is not meant to be a demanding standard," as "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity."  29 C.F.R. § 1630.2(j)(1)(i), (iii). Therefore, "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." *Id.* § 1630.2(j)(1)(iii).

The Defendants set forth two arguments favoring the conclusion that, even assuming the Plaintiff is functionally limited by the onset of a seizure, his overall ability to perform the major life activities of walking, standing, thinking, communicating, moving, and/or remaining conscious is not "substantially limited" by his epilepsy.

First, the Defendants contend that the Plaintiff's epilepsy cannot be disabling, as a matter of law, because his seizures are merely temporary and episodic.  However, this argument appears to be foreclosed by the statutory text, *see* 42 U.S.C. § 12102(4)(D), and the current EEOC regulations, *see* 29 C.F.R. § 1630.2(j)(1)(vii), both of which expressly provide that "[a]n impairment that is episodic or in remission *is* a disability if it would substantially limit a major life activity when active" (emphasis supplied).

Indeed, contrary to the Defendants' position, the Appendix to Part 1630 of the Code of Federal Regulations states that the legislative intent behind this provision was "to reject the reasoning of court decisions concluding that certain individuals with certain conditions – such as epilepsy or post-traumatic stress disorder – were not protected by the ADA because their conditions

were episodic or intermittent."  29 C.F.R. Pt. 1630, App (quoting Statement of Representatives Hoyer and Sensenbrenner, 154 Cong. Rec. H8294-96 (daily ed. Sept. 17, 2008)).

Specifically, in its report on the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553 (2008), the House Judiciary Committee stated that:

> [A]n individual with epilepsy who experiences seizures that result in the short-term loss of control over major life activities, including bodily functions (e.g., uncontrollable shaking, loss of consciousness) or other major life activities (e.g., ability to communicate, walk, stand, think) is disabled under the ADA even if those seizures occur daily, weekly, monthly, or rarely.  This [ ] rule of construction thus rejects the reasoning in cases like *Todd v. Academy Corp.* where the court found that the plaintiff's epilepsy, which resulted in short seizures during which the plaintiff was unable to speak and experienced tremors, was not sufficiently limiting, at least in part because those seizures occurred episodically. . . . It is thus expected that individuals with impairments that are episodic or in remission (e.g., epilepsy, multiple sclerosis, cancer) will be able to establish coverage [under the ADA] if, when active, the impairment or the manner in which it manifests (e.g., seizures) substantially limits a major life activity.

H.R. REP. No. 110-730, at 19-20 (2008) (footnote omitted).

Further, the regulations themselves instruct that epilepsy is the kind of impairment that should "easily" be found to constitute an ADA-qualifying disability because, irrespective of the frequency and/or duration of resulting seizures, it "substantially limits neurological function." 29 C.F.R. § 1630.2(j)(3)(ii).

Thus, in the Court's view, the Defendants' argument challenging the limiting effect of the Plaintiff's episodic seizures is insufficient to warrant the relief sought.  On the contrary, viewing the medical evidence in the light most favorable to the Plaintiff, the Court finds that a jury could logically conclude that, when active – that is, in times of seizure – the Plaintiff's epilepsy substantially limits his ability to walk, stand, think, speak, move, and maintain consciousness.

The cases cited by the Defendants do not compel a contrary conclusion, as they rely on authority and reasoning that predates the liberalizing amendments found in the ADAAA.

For example, in *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867 (2d Cir. 1998), decided a decade prior to the enactment of the ADAAA, the Second Circuit relied on a prior version of 29 C.F.R. § 1630.2,

which, in evaluating the limiting effects of the plaintiff's colitis, expressly directed the court to consider the severity, permanence, and expected duration of her symptoms. Thus, despite finding that, when active, her condition constituted a severe limitation on a major life activity, namely, controlling the elimination of waste, the court nevertheless concluded that, since it was asymptomatic for long periods of time, the plaintiff's colitis was not a disabling condition under the ADA. *Id.* at 871.

Subsequently, in *Quintero v. Rite Aid of N.Y., Inc.*, No. 09-cv-6084, 2011 U.S. Dist. LEXIS 130920 (S.D.N.Y. Nov. 10, 2011), the Southern District similarly relied on the former EEOC regulation to evaluate the limiting effects of the plaintiff's epilepsy by reference to the severity, permanence, and expected duration of her seizures. *See Quintero*, 2011 U.S. Dist. LEXIS 130920, at *30-*31. In granting summary judgment for the plaintiff's employer, the district court noted that evidence pertaining to the frequency and severity of her seizures was "especially critical" in view of decisions like *Ryan*, which had "held that disorders resulting in episodic or temporary restrictions, even if caused by a lifelong impairment, do not rise to the level of a substantial limitation of a major life activity because they are insufficient in duration and long-term impact." *Id.* at *35-37.

In the Court's view, the holdings announced in these cases appear to represent precisely what the House Judiciary Committee sought to reject in favorably reporting on the ADAAA, namely, cases where a plaintiff's epilepsy was found non-disabling because it resulted in seizures that, while briefly debilitating, were short and episodic. These holdings also appear to represent what the EEOC sought to avoid when it replaced the existing regulatory rubric with the current versions of 42 U.S.C. § 12102(4)(D) and 29 C.F.R. § 1630.2(j)(1)(vii), which explicitly authorize district courts to deem a plaintiff disabled if his or her impairment, while episodic, would be substantially limiting in its active state.

Accordingly, to the extent that it seeks to dismiss the Plaintiff's claim under the ADA on the ground that his epilepsy is too episodic or temporary to constitute a disability, the Defendants' motion for summary judgment is denied.

The Court reaches a similar conclusion with respect to the Defendants' second argument, namely, that the Plaintiff's epilepsy cannot be disabling because his condition is well-controlled with medication.  Relying principally on a Supreme Court case entitled *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 119 S. Ct. 2139, 144 L. Ed. 450 (1999), the Defendants argue that "[i]t is well settled, as a matter of law, that no substantial limitation of a major life activity can be shown where an individual is able to correct or control his physical or mental impairment through the use of medication."  Defs. Memo of Law at 7.

However, in the Court's view, the Defendants' reliance on *Sutton* and its progeny is also misplaced, as this argument similarly fails to account for the substantial legal developments wrought by the enactment of the ADAAA.  In particular, the Appendix to Part 1630 of the Code of Federal Regulations explains that *Sutton* itself had been a driving force behind Congress' reformation of the statute:

> The holdings of several Supreme Court cases sharply narrowed the broad scope of protection Congress originally intended under the ADA, thus eliminating protection for many individuals whom Congress intended to protect. [ ] For example, in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), the Court ruled that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures. . . .
>
> Congress concluded that these rulings imposed a greater degree of limitation and expressed a higher standard than it had originally intended, and coupled with the EEOC's 1991 ADA regulations . . . unduly precluded many individuals from being covered under the ADA.

29 C.F.R. Part 1630, App.

According to the EEOC, among the "express purposes of the ADAAA" was "[t]o reject the requirement enunciated in *Sutton* and its companion cases that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating

measures." *Id.* Thus, the statutory text now expressly states that "[t]he determination of whether an impairment substantially limits a major life activity shall be made *without regard to* the ameliorative effects of mitigating measures such as . . . medication . . ." 42 U.S.C. § 12102(4)(E)(i)(I) (emphasis supplied).

Contrary to the Defendants' position, the Second Circuit and district courts within its purview have clearly noted that *Sutton* is no longer good law. *See, e.g., Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 43 n.13 (2d Cir. 2015) (noting that, although not applicable retroactively, "Congress amended the ADA in 2008 'to reject the standard[ ] enunciated by the Supreme Court in [*Sutton*]"); *Krachenfels v. N. Shore Long Island Jewish Health Sys.*, No. 13-cv-243, 2014 U.S. Dist. LEXIS 103474, at *38 (E.D.N.Y. July 29, 2014) (noting that "[t]he ADAAA substantially broadened the definition of a disability under the law, in explicit response to *Sutton*") (internal citation and quotation marks omitted).

Thus, as it now stands, the degree to which the Plaintiff is able to effectively control his epilepsy with medication may not be considered in determining whether he is disabled under the statute. Consequently, to the extent that the Defendants rely on this fact to compel the conclusion that the Plaintiff does not qualify for coverage under the ADA, their motion for summary judgment is denied.

Based on the foregoing, the Court finds that the Plaintiff has satisfactorily established this element of his *prima facie* case, and, to the extent that the Defendant seeks summary judgment on the ground that the Plaintiff failed to establish an ADA-qualifying disability, their motion is denied. Having so held, the Court need not reach the Plaintiff's alternative contention, namely, that the Defendants regarded him as having a disability under 42 U.S.C. § 12102(1)(C).

   b.  As to Whether the Plaintiff has Made a Prima Facie Showing that he Suffered an Adverse Employment Action Because of his Disability

The Defendants further contend that the Plaintiff failed to adduce sufficient evidence of an adverse employment action caused by his disability to justify presenting that question to a jury. The Court disagrees.

   i.  The Applicable Law

There are two distinct components to the fourth element of the prima facie case, namely, (1) the existence of an adverse employment action; and (2) a causal connection between the adverse employment action and the Plaintiff's disability. *See Loren v. Levy*, No. 00-cv-7687, 2003 U.S. Dist. LEXIS 4903, at *15 (S.D.N.Y. Mar. 27, 2003), *aff'd*, 120 F. App'x 393 (2d Cir. 2005).

As to the first component, this Circuit defines an adverse employment action as "a 'materially adverse change' in the terms and conditions of employment." *Sanders v. N.Y. City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (quoting *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 446 (2d Cir. 1999)).

The challenged action must be " 'more disruptive than a mere inconvenience or an alteration of job responsibilities' and can include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished responsibilities, or other indices . . . unique to a particular situation.' " *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 499 (2d Cir. 2009) (quoting *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 363, 340 (2d Cir. 2000)) (quoting, in turn, *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.*, 933 F.2d 132, 136 (7th Cir. 1993)); *see Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 283 (S.D.N.Y. 1999) ("A 'material adverse change' is one that 'has an attendant negative result, a deprivation of a position or an opportunity") (quoting *Medwid v. Baker*, 752 F. Supp. 125, 136-37 (S.D.N.Y. 1990)).

One form of adverse employment action is a constructive discharge, which " 'occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily.' " *Flaherty v. Metromail Corp.*, 235 F.3d 133, 138 (2d Cir. 2000) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F3d 81, 89 (2d Cir. 1996)).

"A constructive discharge is 'functionally the same as an actual termination,' " *Capmbell v. N.Y. City Tr. Auth.*, 93 F. Supp. 3d 148, 170 (E.D.N.Y. 2015), *aff'd*, 662 F. App'x 57 (2d Cir. 2016), and therefore " 'cannot be proven merely by evidence that an employee . . . preferred not to continue working for that employer.' " *Murray v. Town of N. Hempstead*, 853 F. Supp. 2d 247, 269 (E.D.N.Y. 2012) (Spatt, J.) (quoting *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993)). " 'Nor is the test merely whether the employee's working conditions were difficult or unpleasant.' " *Id.* (quoting *Spence*, 995 F.2d at 1156).

Rather, "[a] claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.' " *Stetson v. NYNEX Serv. Co.*, 95 F.2d 355, 361 (2d Cir. 1993) (quoting *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983)) (quoting, in turn, *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1977)).

As to the second component, the fourth element of a prima facie case requires the Plaintiff to produce evidence sufficient to support a reasonable inference that the alleged adverse employment action occurred "because of" his disability. *See Davis v. N.Y. City Dep't of Educ.*, No. 10-cv-3812, 2014 U.S. Dist. LEXIS 30784, at *25 (E.D.N.Y. Mar. 7, 2014) (noting that the Plaintiff must demonstrate circumstances giving rising to an inference of discrimination), *aff'd*, 804 F.3d 231 (2d Cir. 2015).

The Plaintiff may establish this causal connection "in a variety of ways," including by proof of "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus, [or] preferential treatment given to employees outside the protected class." *Id.*

Relevant here, the timing of an adverse employment action may also present sufficient circumstantial evidence to raise an inference of disability discrimination. *See Chertkova*, 92 F.3d at 91. Namely, the requisite causal connection may be shown through proof of close temporal proximity between the employer's receipt of notice of the Plaintiff's disability and an adverse employment action. *See Baron v. Advanced Asset Mgmt. Solutions, LLC*, 15 F. Supp. 3d 274, 283 (E.D.N.Y. 2014) (noting that "courts in this circuit have held that the temporal proximity of an employee's disclosure of a disability to his termination supports an inference of discrimination"); *see also Dister v. Continental Grp., Inc.*, 859 F.2d 1108, 1115 (2d Cir. 1988) (reversing summary judgment for the defendant-employer on the plaintiff's claim for unlawful discharge under ERISA; finding that the timing of the plaintiff's termination, namely, four months and seven days prior to qualifying for enhanced pension benefits, was a circumstance giving rise to an inference of discrimination); *Timbol v. Commercial Bank of Kuwait*, No. 99-cv-1891, 2000 U.S. Dist. LEXIS 2927, at *19 (S.D.N.Y. Mar. 15, 2000) (allegations that a plaintiff was terminated two weeks after providing his employer with mental health diagnosis plausibly stated a claim for discrimination under the ADA); *Bass v. Chemical Banking Corp.*, No. 94-cv-8833, 1996 U.S. Dist. LEXIS 9228, at *16 (S.D.N.Y. July 2, 1996) (noting that the sequence of events leading to the plaintiff's discharge or the timing of the discharge could raise an inference of gender discrimination).

This portion of the analysis " 'necessarily incorporates an inquiry into whether the employer had notice of the plaintiff's disability.' " *Clark v. Jewish Childcare Ass'n*, 96 F. Supp. 3d 237, 251 (S.D.N.Y. 2015) (quoting *McCoy v. Morningside at Home & Aging in Am.*, No. 11-cv-2575, 2014 U.S. Dist. LEXIS 25368, at *12 (S.D.N.Y. Feb. 25, 2014)); *see Pacenza v. IBM Corp.*, 363 F. App'x 128, 130-31 (2d Cir. 2010)

(holding that, "[b]ecause Plaintiff did not adduce evidence that his supervisor had knowledge of his disability, he failed to make a prima facie showing of discrimination under the ADA").

Indeed, " 'if [an employer] were truly unaware that . . . a disability existed, it would be impossible for [an] [employment] decision to have been based, even in part, on [the Plaintiff]'s disability.' " *Pacenza v. IBM Corp.*, No. 04-cv-5831, 2009 U.S. Dist. LEXIS 29778, at *29 (E.D.N.Y. Apr. 2, 2009) (quoting *Raytheon Co. v. Hernandez*, 540 U.S. 44, 55 n.7, 124 S. Ct. 513, 157 L. Ed. 2d 357 (2003)).

With these principles in mind, the Court turns to the parties' substantive contentions.

### ii.    Application to the Facts of this Case

### (A)    Prima Facie Proof of an Adverse Employment Action

In opposition to the present motion, the Plaintiff identifies four alleged adverse employment actions: (1) "being questioned about his disability"; (2) "Russo and Brown having frequent secretive discussions" about him; (3) "the revision of his work assignment and doubling of his workload"; and (4) "the issuance of false memoranda alleging performance deficiencies" and "false allegations of hoarding supplies." *See* Pl. Memo of Law at 17.

As discussed more fully below, the Court finds that the creation of the written memoranda in the record is a potentially adverse employment action, but the other complained-of conduct is not.

Questioning the Plaintiff about his disability.  First the Plaintiff alleges that he was subjected to questioning regarding his disability.  The Court understands this claim to relate to the alleged meeting that took place one week after the Plaintiff first disclosed his epilepsy to Russo.  As discussed above, the only evidence of this meeting is the Plaintiff's testimonial account, which itself is somewhat vague and self-contradictory.  Nevertheless, for purposes of this motion, the Court assumes that the meeting occurred and accepts the Plaintiff's account of what transpired, namely, Brown asked him whether he suffered from epilepsy and the Plaintiff confirmed that he did.

27

Initially, the Court doubts whether this interaction, as it has been described by the Plaintiff, constitutes "questioning" about his disability at the hands of his employer.  Construed in the light most favorable to the Plaintiff, the record shows that, in a private meeting with his immediate supervisors, Brown asked the Plaintiff one time whether, in fact, the Plaintiff suffered from epilepsy. In the Court's view, this is not "questioning" in the customary adversarial style, as the Plaintiff seems to imply.  On the contrary, it appears to be a reasonable response by Brown to information presented to him regarding the Plaintiff's report of on-the-job symptoms.

In any event, even assuming that Brown's inquiry can be viewed as "questioning" the Plaintiff about his disability, the record lacks any indication that it qualifies as an adverse employment action.  Namely, there is no evidence concerning Brown's reaction to learning of the Plaintiff's condition, let alone any evidence that this conversation materially altered any aspect of the Plaintiff's working conditions.  Accordingly, even accepting the Plaintiff's version of the facts regarding this meeting, there is no basis to conclude that it constituted a materially adverse change in the terms or conditions of his employment.  *See, e.g.*, *Cintron v. Atticus Bakery, LLC*, No. 14-cv-1224, 2017 U.S .Dist. LEXIS 37747, at *16-*18 (D. Conn. Mar. 16, 2017) (allegedly intrusive questioning by coworkers and management did not rise to the level of an adverse employment action under Title VII).

Supervisors engaging in secretive discussions about the Plaintiff.  The Plaintiff also alleges that Brown and Russo had secretive meetings about him, which contributed to an overall atmosphere of discrimination.   However, this claim is speculative, as there is no evidence in the record pertaining to any of these alleged meetings, and the single page of deposition transcript that the Plaintiff cites in support of this fact deals with an entirely different subject.  *See* Pl. Memo of Law at 3 (citing page 207 of his deposition transcript, which does not contain testimony regarding allegedly secretive meetings between Brown and Russo).   Accordingly, in this case, allegedly secretive meetings among the Plaintiff's supervisors do not constitute adverse employment actions.

Revised work assignment.  The Plaintiff further contends that, soon after disclosing his disability to Russo, he was reassigned to clean the all of the bathrooms in the High School, plus the gym – a modification of his responsibilities that "effectively doubled" his workload.

As an initial matter, the Second Circuit has held that "the assignment of 'a disproportionately heavy workload' can constitute an adverse employment action." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (quoting *Feingold v. New York*, 366 F.3d 138, 152-53 (2d Cir. 2004)).  Thus, accepting the Plaintiff's characterization of his reassignment to cleaning the bathrooms and the gym as doubling his usual workload, the Court finds that it could be more disruptive than a mere inconvenience or an alteration of job responsibilities.

However, even if the Court were inclined to accept this premise, the Plaintiff's revised work assignment cannot support an inference of discrimination because the timetable he presents is contradicted by the undisputed facts in the record.  Namely, as noted above, for purposes of this motion, the Plaintiff contends that his reassignment closely followed his disclosure to Russo that he suffers from epilepsy, and that the timing of these events is therefore circumstantial evidence of a discriminatory motive.  Yet in his counterstatement of undisputed facts, the Plaintiff concedes that his reassignment occurred in the summer of 2013, *see* 56.1 Stmt. ¶ 76, several months *before* disclosing his disability to anyone at the District in December of that year, *see id.* ¶ 94.

Therefore, by the Plaintiff's own admission, it cannot be true that his reassignment was an adverse employment action because of his disability, and in the Court's view, based on the undisputed facts in the record, no rational juror could so find.

False allegations of performance deficiencies.  Finally, the Plaintiff contends that the numerous written memoranda attributing to him various performance deficiencies and other misconduct were adverse employment actions.  Specifically, as discussed more fully above, the Plaintiff disputes the timing and veracity of the April 15, 2008 memo from Russo to Brown

describing a confrontation between the Plaintiff and a coach and outlining other performance issues; the June 13, 2013 memo from Russo to Brown reporting the Plaintiff's supposed habit of hoarding cleaning supplies and outlining other performance issues; the July 1, 2013 memorandum documenting a meeting regarding the performance issues raised in Russo's June 13, 2013 memo; the October 2, 2013 written checklist and its underlying computer data, which was created to assist the Plaintiff in adequately cleaning the school's bathrooms; and the October 30, 2013 memo by Russo chronicling the walk-through of the Plaintiff's work area due to reported performance deficiencies.

The Plaintiff contends that all of these documents were fabricated after he disclosed his disability in order to create the appearance of a performance-based reason for the District to take disciplinary action against him. Even as to those memoranda that he admittedly signed, the Plaintiff claims that he was coerced to do so, after the fact, under threats of termination if he refused.

In general, neither false accusations of wrongdoing nor negative reports or performance evaluations are sufficient to constitute adverse employment actions, unless they give rise to material adverse changes in the Plaintiff's work conditions. *See Spaulding v. N.Y. City Dep't of Educ.*, No. 12-cv-3041, 2015 U.S. Dist. LEXIS 127076, at *133 (E.D.N.Y. Feb. 19, 2015) (Report and Recommendation) (noting that "[a] false accusation, absent a change in the terms and conditions of employment, is not sufficient to state an adverse employment action"), *adopted in relevant part*, 2015 U.S. Dist. LEXIS 126292 (E.D.N.Y. Sept. 21, 2015); *Dasrath v. Stony Brook Univ. Med. Ctr.*, No. 14-cv-1484, 2015 U.S. Dist. LEXIS 32805, at *30-*31 (E.D.N.Y. Mar. 17, 2015) (noting that "while 'negative reports or evaluations alone are generally not adverse employment actions . . . they can be considered adverse employment actions when they give rise to material adverse changes in work conditions' ") (quoting *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 217 (E.D.N.Y. 2014)).

In this case, the District relies on the written memoranda in the record to support its position that the Plaintiff had a history of performance issues leading up to the candy-stealing

incident that ultimately prompted his resignation in the face of more severe disciplinary action. Thus, the Defendants essentially concede that these documents formed the basis for a materially adverse change in the Plaintiff working conditions.

However, there is also testimonial evidence to suggest that these documents were false and that the District used them to give the appearance of a checkered employment history and incremental warnings, so to provide an ostensible basis for coercing the Plaintiff's resignation.

In the Court's view, these diverging accounts present clear questions of fact and witness credibility, which are inappropriate for resolution on a motion for summary judgment. Rather, it is sufficient at this juncture to observe that it appears to be undisputed that the written memos, truthful or not, played an integral role in the events in question, including the Plaintiff's separation from the District. The Court thus finds that a rational juror believing the Plaintiff's version of the relevant events would be justified in concluding that the creation of the allegedly false memoranda gave rise to a materially adverse change in the terms and conditions of his employment.

Based on the foregoing, the Court concludes that the Plaintiff has adduced sufficient evidence to support a reasonable inference that the creation of memoranda containing allegedly false accusations of wrongdoing and negative performance evaluations may potentially constitute an adverse employment action. However, in the Court's view, the Plaintiff's allegations of being questioned about his disability; of being the subject of secretive meetings between Russo and Brown; and of having his work assignment revised, do not rise to the level of a materially adverse change in the Plaintiff's employment.

### (B)    Prima Facie Proof of a Constructive Discharge

Further, the Plaintiff alleges that he was constructively discharged when, during the March 3, 2014 meeting with Brown, he was given the choice to resign or face severe consequences including termination, possible arrest, and impediments to securing alternative employment. In the Court's view, there is enough evidence on both sides of this question to raise an issue of fact for trial.

As discussed above, the Defendants rely on the written memoranda in the record to show that the Plaintiff had a history of performance deficiencies and workplace misconduct that culminated with his stealing candy from a school administrator's office – the "final straw" that resulted in an ultimatum to resign or face more severe discipline.

On the other hand, the Plaintiff testified that he worked at the District for twelve years without his performance ever being called into question, a fact ostensibly supported by a highly favorable performance evaluation from 2003.  However, after experiencing a recurrence of his long-asymptomatic epilepsy, which he disclosed to his supervisors, the Plaintiff claims there was a clear change in the District's attitude toward him which included subjecting him to excessive scrutiny; fabricating past performance issues; and ultimately forcing his resignation over a minor incident with threats of arrest and barriers to employment as a cleaner in another school.

In the Court's view, accepting the Plaintiff's account of the March 3, 2014 meeting, a jury could conclude that the Plaintiff effectively had no choice but to resign.  *See Rupert v. City of Rochester*, 701 F. Supp. 2d 430, 439 (W.D.N.Y. 2010) ("A triable issue of fact as to constructive discharge may be demonstrated by proof that an employee was presented with the decision to resign or be fired").

Although, as a general matter, "to establish a constructive discharge, it is not enough for a plaintiff to resign instead of facing potential disciplinary charges," *Fotopolous v. Bd. of Fire Comm'rs of the Hicksville Fire Dist.*, 11 F. Supp. 3d 348, 366 (E.D.N.Y. 2014), the result may be different where, as here, an employee apparently risks more than simply job loss, *see Monroe v. Cnty. of Orange*, No. 14-cv-1957, 2016 U.S. Dist. LEXIS 132408, at *81-*82 (S.D.N.Y. Sept. 27, 2016); *see also Fotopolous*, 11 F. Supp. 3d at 367 (denying summary judgment on a constructive discharge claim where, "weighing the evidence in the light most favorable to Plaintiff, a reasonable jury could [have] conclude[d] that Plaintiff was faced with more than the mere possibility of discipline or rumors of termination, and that he resigned because of the threat of termination, arrest and/or prosecution"); *McCalla v. SUNY Downstate*

*Med. Ctr.*, No. 03-cv-2633, 2006 U.S. Dist. LEXIS 38175, at *13-*14 (E.D.N.Y. June 8, 2006) (allegations that the plaintiff was presented with a resignation letter and told to resign or the defendant would "ruin [his] career" plausibly stated a claim for constructive discharge under Title VII).

Guided by these authorities, and accepting the Plaintiff's version of the relevant events, the Court finds that a reasonable person may have felt similarly compelled to resign under the circumstances. This is especially true when viewed in the broader context of the Plaintiff's working conditions.

In that regard, although the Plaintiff's allegations of being questioned about his disability; of being the subject of secretive meetings between Russo and Brown; and of having his work assignment revised may not themselves be sufficient to constitute adverse employment actions, they may nevertheless be relevant and contribute to the factual dispute surrounding the reasonableness of the Plaintiff's resignation. *See Chertkova*, 92 F3d at 90 (noting that "the effect of a number of adverse conditions in the workplace is cumulative . . . [b]ecause a reasonable person encounters life's circumstances cumulatively, and not individually").

Accordingly, in the Court's view, the Plaintiff has also adduced sufficient evidence to support a reasonable inference that he was constructively discharged by the District. Therefore, the analysis now shifts to the second component of the relevant standard, namely, whether there is some non-speculative basis to conclude that the adverse employment actions identified above occurred "because of" the Plaintiff's disability.

### (C)   Prima Facie Proof of Causation

As an initial matter, the Court reiterates its earlier observation that this portion of the analysis necessarily incorporates an inquiry into whether the Defendants had notice of the Plaintiff's disability, for " 'if [an employer] were truly unaware that . . . a disability existed, it would be impossible for [an] [employment] decision to have been based, even in part, on [the Plaintiff]'s disability.' " *Pacenza*, 2009 U.S. Dist. LEXIS 29778, at *29, *aff'd*, 363 F. App'x 128 (2d Cir. 2010).

In this case, there is a clear factual dispute precluding summary judgment as to the whether the Defendants knew of the Plaintiff's epilepsy at the relevant times.

The District contends that the only person to whom the Plaintiff disclosed his disability was Russo, whom all parties agree lacked the authority to hire or fire employees, and, in any event, did not participate in the March 3, 2014 meeting at which the Plaintiff resigned. In fact, in a sworn affidavit, Brown, the relevant decisionmaker in this case, denied knowledge that the Plaintiff suffered from epilepsy at any time prior to his resignation.

On the other hand, as described above, the Plaintiff contends that he was summoned to a meeting one week after disclosing his disability to Russo at which he personally notified Brown of his condition. It is the Plaintiff's position that this meeting directly coincides with the increasingly hostile posture that the District took toward him.

In the Court's view, these wholly divergent accounts of whether and when the Defendants knew of the Plaintiff's disability present a genuine issue of material fact for trial.

In reaching this conclusion, the Court does not overlook the apparent inconsistencies in the Plaintiff's version of these events, including the apparently conflicting accounts of this meeting that he gave at his deposition. However, assessing the Plaintiff's credibility and weighing his testimony are jury functions, and the mere existence of inconsistencies in the record does not provide a proper basis to grant summary judgment for the Defendants. *See Reeves v. Johnson Controls World Servs.*, 140 F.3d 144, 157 (2d Cir. 1998) ("To the extent that these inconsistencies can only be resolved based upon credibility determinations, such questions of witness credibility are to be decided by the jury"); *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994) ("Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not the court on summary judgment").

On the contrary, construing the evidence in the light most favorable to the Plaintiff, and granting him the benefit of every favorable inference, *see Kronisch v. United States*, 150 F.3d 112, 129 (2d

Cir. 1998), the Court finds that a jury believing his version of the relevant events could logically conclude that the District and Brown had notice of the Plaintiff's condition prior to his resignation.

Further, as discussed above, the Plaintiff may satisfy his burden at this stage of the analysis, and raise the necessary inference of discrimination, through proof of close temporal proximity between the Defendants' receipt of notice of his disability and the adverse employment actions outlined above. *See Baron*, 15 F. Supp. 3d at 283.

District courts are somewhat divided on the length of time that must elapse before the causative chain is broken. While some cases have plainly found that a three-month gap is sufficient to support an inference of discrimination, *see, e.g., Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 522 (S.D.N.Y. 2004), others have relied on a closer temporal relationship to find the necessary causative link, *see, e.g., Baron*, 15 F. Supp. 3d at 283 (finding that a period of 5-6 weeks between disclosing the need for surgery and termination was sufficient to support an inference of discrimination); *Kennebrew v. N.Y. City Hous. Auth.*, No. 01-cv-1654, 2002 U.S. Dist. LEXIS 3038, at *60-*62 (S.D.N.Y. Feb. 26, 2002) (Report and Recommendation) (finding a "temporal causation issue" where, "in the one month after announcing that she was pregnant, [the plaintiff] received three counseling memos and two unsatisfactory performance evaluations"), *adopted*, 2002 U.S. Dist. LEXIS 29293 (S.D.N.Y. July 8, 2002); *Timbol*, 2000 U.S. Dist. LEXIS 2927, at *19 (finding that a two-week gap between the disclosure of a mental health diagnosis and termination was sufficient to support an inference of discrimination).

Crediting the Plaintiff's version of events, the Court is inclined to find that, given the overall length of his employment with the District and the apparent lack of any prior disciplinary action, the three-month gap between the disclosure of his epilepsy and his allegedly forced resignation is sufficient to raise an inference of a discriminatory motive.

Further, in a related context, this Court previously found the Second Circuit's reasoning in the case of *Espinal v. Goord*, 558 F.3d 119 (2d Cir. 2009), to be persuasive on the matter of temporal proximity.  There, an inmate in a New York correctional facility alleged that prison workers had used excessive force against him and denied him medical treatment in retaliation for prior lawsuits the Plaintiff filed.  Noting that permissible inferences to be drawn from temporal proximity should be made flexibly "in the context of particular cases," *id.* at 129, the Second Circuit reversed the district court's finding that the passage of six months between the plaintiff's protected activity and the alleged retaliation was too temporally remote to support an inference of retaliation.  On the contrary, the court reasoned that:

> [T]he passage of only six months between the dismissal of Espinal's lawsuit and an allegedly retaliatory beating by officers, one of whom . . . was a defendant in the [plaintiff's] prior lawsuit, is sufficient to support an inference of a causal connection.  It is plausible that the officers waited to exact their retaliation at an opportune time – as when Espinal was involved in a fight with another inmate – in order to have a ready explanation for any injuries suffered by Espinal.

*Id.* at 129 (internal citation omitted)

The Court subsequently applied this reasoning to a Title VII lawsuit involving a school administrator's claim that he was denied tenure as retaliation for filing complaints of unfair treatment by the school board president.  *See Geras v. Hempstead Union Free Sch. Dist.*, 149 F. Supp. 3d 300 (E.D.N.Y. 2015) (Spatt, J.).

In particular, the Court found that the six-month gap between the plaintiff's complaints and the school board's vote to deny him tenure was not so temporally remote as to warrant summary judgment.  Rather, applying the teachings of *Espinal*, the Court reasoned that it was "particularly wary of focusing too narrowly on temporal proximity . . . because the Board of Education has limited opportunities to act in an official capacity, namely, at public meetings and executive sessions, which usually are convened on a monthly basis."  *Id.* at 332.

Thus, as in *Espinal*, the Court [found] the Plaintiff's contention to be plausible that the Board waited to exact its retaliation against him at an opportune time, namely, a regularly-scheduled Board meeting at which his recommendation for tenure was presented for a vote. On [that motion] record, a reasonable jury could [have] conclude[d] that the Board did so "in order to have a ready explanation" in the event that its actions were called into question in, for example, a federal discrimination lawsuit.

*Id.*

In the Court's view, similar reasoning is appropriate here. Namely, in support of his argument that the February 2014 candy-stealing incident was merely a pretext for the District's discriminatory motive, the Plaintiff argues that a question of fact is raised by the disproportionately harsh punishment he received for eating a few pieces of candy from a teacher's candy bowl. In this regard, the Plaintiff's sworn affidavit states that he received no training or other indication that taking candy in this manner would be deemed a terminable offense. *See* Pl. Aff. ¶ 8. According to the Plaintiff, this is especially true given that the incident occurred on Valentine's Day, when it was customary for classrooms and offices to display candy for communal use. *See id.* ¶ 9.

Nor, it seems, was the Plaintiff ever disciplined for misconduct related to alleged theft prior to this incident. Although Russo's June 13, 2013 memo purports to document a pattern of conduct by the Plaintiff whereby he hoarded cleaning supplies; and although the Defendants apparently suspected that the Plaintiff's method of leaving classrooms unlocked while he cleaned his section may have facilitated theft by third parties, the record otherwise lacks any indication that the Plaintiff was previously accused of stealing school property or disciplined for any of the conduct described in the memos. Thus, accepting the Plaintiff's version of events as true, the Court finds that a reasonable inference of discrimination may be drawn from the fact that, without taking any progressive disciplinary actions, the Defendants immediately forced the Plaintiff to resign over an arguably minor infraction.

Indeed, harkening back to *Espinal*, the Court is of the view that a rational jury, crediting the Plaintiff's testimony regarding his otherwise unblemished employment history, could logically

conclude that the candy-stealing incident, which occurred approximately three months after he first disclosed his epilepsy and on-the-job symptoms, presented an opportune time for the District to constructively terminate the Plaintiff. In the Court's view, a jury could find that the District meted out a disproportionately severe punishment for this infraction "in order to have a ready explanation" in the event that its underlying motives were later called into question.

Accordingly, the Court finds that the Plaintiff has also established this element of his prima facie case, thereby shifting the burden of proof to the Defendants to demonstrate legitimate, non-discriminatory reasons for their alleged adverse employment actions.

### 2. Legitimate, Non-Discriminatory Reasons

At the second step of the *McDonnell Douglas* analysis, the Defendants' burden to offer a legitimate, non-discriminatory rationale for the adverse employment action is "light," and the employer is required to "simply articulate an explanation that, if true, would connote lawful behavior.' " *Penberg v. HealthBridge Mgmt.*, 823 F. Supp. 2d 166, 176 (E.D.N.Y. 2011) (quoting *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998)); *see Sethi v. Narod*, 12 F. Supp. 3d 505, 522 (E.D.N.Y. 2014) (noting that the Defendants' burden at this stage "is not a particularly steep hurdle"; it is "one of production, not persuasion" and "can involve no credibility assessment") (internal citations omitted).

In this case, the Court finds that, as to their decision to accept the Plaintiff's resignation in lieu of more serious disciplinary action, the Defendants have carried their light burden of articulating an explanation which, if true, would demonstrate lawful behavior. In particular, the Court is satisfied that the numerous written memoranda in the record purportedly documenting various performance deficiencies on the part of the Plaintiff, together with the surveillance footage depicting the Plaintiff entering Hughes's locked office seemingly for the sole purpose of helping himself to her candy, are sufficient to shift the burden back to the Plaintiff to establish that those reasons were actually a pretext for disability discrimination.

3.      **Pretext**

It is well-settled that a discrimination plaintiff may rely on the same evidence to establish pretext as he used to support his prima facie case. *See Kerzer v. Kingly Mfg.*, 156 F.3d 396, 402 (2d Cir. 1998); *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994) ("Pretext may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence or by reliance on the evidence comprising the prima facie case, without more") (internal quotation marks and citations omitted); *Beirne v. Fieldcrest Cannon*, No. 92-cv-3282, 1997 U.S. Dist. LEXIS 4862, at *17-*18 (S.D.N.Y. Apr. 16, 1997) ("Where, as here, a plaintiff has established his prima facie case through evidence that the [adverse employment actions] occurred in circumstances giving rise to an inference of discrimination, the plaintiff is permitted to rely on the same evidence to demonstrate pretext").

In fact, "'unless the employer has come forward with evidence of a *dispositive* nondiscriminatory reason[ ] as to which there is no genuine issue and which no rational trier of fact could reject, the conflict between the plaintiff's evidence establishing a prima facie case and the employer's evidence of a nondiscriminatory reason reflects a question of fact to be resolved by the factfinder after trial.'" *Id.* at *18 (emphasis in original) (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)).

Indeed, the Supreme Court has held that, because the defendant's burden at the second stage of the *McDonnell Douglas* test is not to "persuade the court that it was actually motivated by the proffered [non-discriminatory] reasons," *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255, 101 S. Ct. 1089, 67 L. Ed. 207 (1981), "[t]he factfinder's disbelief of the reasons put forward by the defendant . . . may, together with the elements of the prima facie case, suffice to show intentional discrimination," *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).

In this case, construing the record in the light most favorable to the Plaintiff, the Court finds that there is a sufficient basis, as outlined above, for a reasonable trier of fact to doubt the Defendants' explanation and ultimately find that the Plaintiff's disability was the true reason behind the challenged employment decisions.

In reaching this conclusion, the Court is mindful that the burden of establishing pretext is higher than that required to establish a prima facie case of discrimination. *See John v. Kingsbrook Jewish Med. Ctr.*, No. 11-cv-3624, 2014 U.S. Dist. LEXIS 39322, at *51-*52 (E.D.N.Y. Mar. 25, 2014), *aff'd*, 598 F. App'x 798 (2d Cir. 2015). Thus, "[w]hile timing may be sufficient to establish an inference of discrimination, the close proximity of a termination to the plaintiff's announcement of [a disability] alone is insufficient to demonstrate a pretext." *Kennebrew*, 2002 U.S. Dist. LEXIS 3038, at *61-*62.

Nevertheless, as noted above, the Plaintiff argues persuasively that the disproportionately harsh punishment he received for a minor infraction that he had no apparent reason to believe was a terminable offense, and which occurred just three months after disclosing his disability for the first time in a lengthy tenure with the District, provides the additional support necessary to clear the evidentiary hurdle at this stage of the analysis.

Although persuasive in its own right, the Court is unable to conclude that the District's non-discriminatory explanation for its actions is dispositive, so that no rational jury could justifiably reject it. On the contrary, the Plaintiff has presented a conflicting factual account of the relevant events, which, if believed, would potentially entitle him to relief.

Accordingly, the Court denies the Defendants' motion for summary judgment to the extent it seeks to dismiss the Plaintiff's claims against the District and Brown, in his official capacity, for disability discrimination under the ADA.

The Court notes that the Plaintiff also brought this claim against Brown in his individual capacity. However, there is no right of recovery against individual defendants under the ADA. *See*

*Corr v. MTA Long Island Bus*, No. 98-cv-9417, 1999 U.S. Dist. App. LEXIS 25058, at *5 (2d Cir. Oct. 7, 1999). Therefore, to the extent that the Defendants seek summary judgment dismissing this claim against Brown, individually, their motion for such relief is granted.

Also, in opposition to the present motion, the Plaintiff voluntarily withdrew his claim based on a hostile work environment under the ADA. *See* Pl. Memo of Law at 2. Accordingly, to the extent that the Defendants seek summary judgment dismissing that claim, their motion for such relief is also granted.

**C.    The Plaintiff's Claims under § 1983**

Finally, based on the same operative facts as outlined above, the Plaintiff brings a claim against the Defendants for disability discrimination under § 1983, alleging that his equal protection rights, as guaranteed by the Fourteenth Amendment, were violated as a result of the Defendants' conduct.

However, as this Court recently observed, "[i]n general, '[f]reedom from discrimination on the basis of disability is a right secured by statute, not the Constitution.'" *Prentice v. Port Auth. of N.Y. & N.J.*, No. 15-cv-738, 2017 U.S. Dist. LEXIS 78272, at *13 (E.D.N.Y. May 23, 2017) (Spatt, J.) (quoting *Lener v. Hempstead Pub. Sch.*, 55 F. Supp. 3d 367, 281 (E.D.N.Y. 2014). "And the law in this Circuit is clear that '[a] § 1983 action may not . . . be brought to vindicate rights conferred only by a statute that contains its own structure for private enforcement.'" *Fierro v. New York City Dep't of Educ.*, 994 F. Supp. 2d 581, 590 (S.D.N.Y. 2014) (quoting *Patterson v. City of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004)). "Thus, where a claim of disability discrimination is premised on the substantive rights provided by the ADA, it will not be independently actionable under § 1983." *Prentice*, 2017 U.S. Dist. LEXIS 78272, at *13-*14; *see Eskenazi-Mcgibney v. Connetquot Cent. Sch. Dist.*, 84 F. Supp. 3d 221, 235-36 (E.D.N.Y. 2015) (noting that, "to the extent [the plaintiff]'s claim of disability discrimination in violation of the equal protection clause is premised upon substantive rights provided by the ADA,

the claim is not actionable under Section 1983"); *Pape v. Bd. of Educ. of the Wappingers Cent. Sch. Dist.*, No. 07-cv-8828, 2009 U.S. Dist. LEXIS 91738, at *20-*21 (S.D.N.Y. Sept. 29, 2009) (dismissing a § 1983 disability discrimination claim on the ground that it involved " 'the type of alleged discrimination that . . . the ADA [is] designed to protect against, not the Equal Protection Clause' ") (quoting *Essen v. Bd. of Educ. of Ithaca City Sch. Dist.*, No. 92-cv-1164, 1996 U.S. Dist. LEXIS 5231, at *29 (N.D.N.Y. Apr. 15, 1996)); *Brown v. Research Found. of SUNY*, No. 08-cv-592, 2009 U.S. Dist. LEXIS 45971, at *34 (N.D.N.Y. May 28, 2009) (dismissing a § 1983 disability discrimination claim on the ground that the ADA "contain[s] [its] own structure for private enforcement"), *aff'd*, 381 F. App'x 119 (2d Cir. 2010).

In this case, separate and apart from his rights secured under the ADA, the Plaintiff has not meaningfully identified any constitutional basis upon which a § 1983 disability discrimination claim might be predicated.

Although the complaint contains passing references to conduct that is arguably distinct from that which underpins his employment discrimination claim – namely, an alleged custom and practice on the part of the District to discriminate against disabled individuals; an alleged failure by District officials to properly investigate allegations of discrimination; an alleged failure by District officials to properly train and supervise its employees; and alleged conduct by Brown and other unspecified District policymakers to condone discriminatory behavior – the complaint lacks any non-conclusory facts to support these allegations and the record apparently lacks any evidence to justify submitting them to a jury.   In fact, the Plaintiff's legal memorandum submitted in opposition to the present motion fails to set forth any facts or analysis favoring the viability of these legal theories.

Under these circumstances, the Court is unable to conclude that the Plaintiff has adduced sufficient evidence of an independent constitutional violation to raise a genuine issue of material fact

for trial.   Accordingly, to the extent that the Defendants seek summary judgment dismissing the Plaintiff's § 1983 claim based on disability discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment, their motion for such relief is granted.

### III.   Conclusion

Based on the foregoing, the Defendants' motion for summary judgment is granted in part and denied in part.

In particular, the Court grants summary judgment dismissing: (1) the Plaintiff's claim against Brown, in his individual capacity, for disability discrimination under the ADA; (2) the Plaintiff's claim based on an ADA hostile work environment; and (3) the Plaintiff's claim based on disability discrimination under § 1983.

However, the Court denies summary judgment as to the Plaintiff's claim against the District and Brown, in his official capacity, based on disability discrimination under the ADA.

This matter is hereby recommitted to United States Magistrate Judge A. Kathleen Tomlinson for the completion of discovery.

It is **SO ORDERED.**

Dated:  Central Islip, New York
        July 18, 2017

                                                    /s/ Arthur D. Spatt
                                                    _____
                                                    ARTHUR D. SPATT
                                                    United States District Judge